Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 6884 | **DATE** | 3/14/2002 |
| **CASE TITLE** | PlayWood Toys, Inc. vs. Learning Curve Toys, L.P. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Amended Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 1 5 2002 date docketed | |
| | Notified counsel by telephone. | | | 204 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK 02 MAR 14 PM 5:22 | 3/13/2002 date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | |



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PLAYWOOD TOYS, INC., )<br>)<br>Defendant/Counter-Plaintiff, )<br>)<br>v. )<br>)<br>LEARNING CURVE TOYS, L.P., )<br>)<br>Plaintiff/Counter-Defendant. )<br>)<br>ROY WILSON, an individual, HARRY )<br>ABRAHAM, an individual, and JOHN )<br>LEE, an individual, )<br>)<br>Counter-Defendants. ) | No. 94 C 6884<br><br>Judge<br>Rebecca R. Pallmeyer |

## AMENDED MEMORANDUM OPINION AND ORDER

In this case, pending far too long before this court, PlayWood Toys claims that Learning Curve Toys misappropriated PlayWood's trade secret concerning the design for toy railroad track. PlayWood claims the misappropriation took place at a meeting with Learning Curve representatives in Canada on February 18, 1993, at which PlayWood's president, Robert Clausi, conveyed his idea for an improvement in the wood track widely available in the marketplace. Late in 1994, PlayWood learned that Learning Curve was selling a product called "Clickity Clack Track," which PlayWood contends incorporates Clausi's idea. PlayWood cried foul, and this litigation followed.

PlayWood Toys won a jury verdict on its claim of misappropriation of a trade secret. PlayWood moved for entry of judgment on that verdict, but the court declined to do so until considering Learning Curve's Rule 50 motion for judgment in its own favor as a matter of law. After reviewing the record and the controlling case law with care, the court now concludes the Rule 50 motion should be granted and that judgment

should be entered in favor of Learning Curve.

## DISCUSSION

Before permitting the jury to reach a verdict, the court must determine first "whether there is any [evidence] upon which a jury could properly proceed to find a verdict for the party producing it." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The court "must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250; *see Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 452 (7th Cir. 1991) (reversing a jury verdict where the court found no "substantial evidence" sufficient to support it); *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 515 (7th Cir. 1990)(affirming directed verdict in absence of substantial evidence to support a verdict for the claimant). To survive a Rule 50 motion, the plaintiff must offer "more than a mere scintilla of evidence and may not rely on conjecture or speculation" to justify the submission of an issue to the jury. *Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 8 (1st Cir. 1998) (internal quotations omitted).

Both parties agree that Illinois law applies to PlayWood's substantive claim. Under that law, a trade secret is defined as

> information, including but not limited, to technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value . . . from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Illinois Trade Secrets Act, 765 ILCS § 1065/2(d). Learning Curve complains that what PlayWood has characterized as its trade secret has varied over time, and the court

2

concurs that analysis of this claim is complicated by the various ways PlayWood has identified its alleged secret. In its Amended Counterclaim, PlayWood alleged that it disclosed to Learning Curve its "confidential product and production plans, ideas, designs, formulas, processes and samples for toy products, . . . (e.g. toy train track)." (Amended Counterclaim, Exhibit A to Memorandum in Support of Defendants' Motion for Directed Verdict (hereinafter, "Defendants' Memo"), ¶ 20.) PlayWood also alleged that its principal, Robert Clausi, disclosed "an idea for a ridged track design . . . and the name 'Clickity-Clack Track' for the track." (*Id.* ¶ 23.) In summary judgment submissions, PlayWood variously described its trade secrets as "the idea for Clickity Clack Track," an "idea for cutting grooves into the wooden track to give the impression of a railroad tie, as well as cutting into the rail in order to allow the train to make a Clickity Clack sound as it rolls across the track," "a prototype of the improved product," "a name for the product – 'Clickity Clack Track'," and "the method of how to do it." (PlayWood's Rule 12(N)(3)(a) Statement of Facts, Exhibit B to Defendants' Memo, ¶ 38; ¶¶ 3,4 ,5.) As of the time of trial in this case, PlayWood had withdrawn any claim to a trade secret in the name "Clickity-Clack Track," the name under which Learning Curve now sells its successful wooden train track product.

Clickity Clack Track is part of a line of products Learning Curve produces under a license with Britt Allcroft, a company which owns rights in the "Thomas the Tank Engine" character popularized by a PBS children's television program. In 1993, Learning Curve was a new company which held this valuable license, but whose manufacturing contractor was facing bankruptcy. Anxious to find an alternative source of supply for its products, Learning Curve's principals, Harry Abraham and Roy

3

Wilson, traveled to Canada and met with Rob Clausi and his brother-in-law Scott Moore, both of PlayWood, at a woodworking shop operated by their business associate, Mario Borsato. In the course of a discussion of PlayWood's manufacturing capabilities, Clausi handed a piece of what the parties refer to as "plain vanilla" track -- that is, smooth wooden train track -- to Mr. Borsato and directed him to cut grooves across the face of the track. Mr. Borsato did so, first making cuts in the elevated side rims of the track only. Mr. Clausi inspected this effort and directed Mr. Borsato to try again, this time making deeper cuts into the track grooves. Mr. Clausi acknowledged that neither of these attempts resulted in a functional product: the first iteration left smooth grooves, through which the toy train cars pass noiselessly, while the second cutting resulted in such deep grooves that the toy cars would not roll through the track.

It is this brief exercise in woodcutting that PlayWood now characterizes as a trade secret. The jury was properly instructed that in considering whether it qualifies for that label, the jury must consider

> one, the extent, if any, to which the information was known outside of PlayWood; two, the extent to which information was known by employees and others involved at PlayWood; three, the extent of measures taken by PlayWood to guard the secrecy of the information; four, the value of the information to PlayWood and its competitors; five, the amount of effort or money expended by PlayWood in developing the information; and six, the ease or difficulty with which the information could be properly acquired by others without using any improper means.

Jury Instructions, Transcript of Proceedings at 1448; *see ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 93, 273 N.E.2d 393, 396 (1971), citing RESTATEMENT OF TORTS, § 757, comment b, p. 6. Considering the evidence in the light most favorable to PlayWood with these six factors in mind, the court concludes it was insufficient to support a

4

verdict in PlayWood's favor on the existence of a trade secret.

**PlayWood's Idea is not a "Secret"**

In determining whether PlayWood's cut track idea constitutes a trade secret, the court considers, first, the extent, if any, to which the information was known outside of PlayWood. This factor overlaps to a substantial degree with the sixth factor -- that is, the ease or difficulty with which the information could be properly acquired by others without using any improper means. The court notes, first, that PlayWood did not demonstrate that the process of cutting slits into toy railroad track is unknown or a secret at all. Ordinarily, a product or service within the realm of general skills and knowledge in the industry cannot be a trade secret. PlayWood appears to believe this test of secrecy is met merely because notched wooden track was not on the marketplace prior to February 1993. The law is clear, however, that being the first or only one to use certain information or implement a certain procedure does not transform the information or procedure into a trade secret. *See Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 319 (N.D. Ill. 1995); *Pope v. Alberto-Culver Co.*, 296 Ill. App. 3d 512, 516, 694 N.E.2d 615, 617-18 (1st Dist. 1998).

As the Federal Circuit observed recently, "[s]ecrecy" may be measured by "the ease with which information can be developed through proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret." *C & F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1302 (Fed. Cir. 2000), quoting *Hamer Holding Group, Inc. v. Elmore,* 202 Ill. App. 3d 994, 148 Ill.Dec. 310, 560 N.E.2d 907, 918 (1st Dist. 1990); *Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063, 1072 (7th Cir. 1992). Had PlayWood succeeded in

5

producing and marketing notched track, the appearance of the track product itself would have fully revealed the concept PlayWood now claims as a secret. Similarly, in *Filter Dynamics Intern., Inc. v. Astron Battery, Inc.,* 19 Ill. App. 3d 299, 317, 311 N.E.2d 386, 401 (2d Dist. 1974), where plaintiff claimed a trade secret in its packaging product, the court noted that defendant was allegedly able to misappropriate the secret merely by "examining the box, unfolding it, and measuring it in the course of two visits to plaintiffs' warehouse office." As in this case, defendant in *Filter Dynamics* engaged in this improper activity even before plaintiff's box was available in the market place, but this fact did not distract the court from determining that plaintiff's packaging technique was no "trade secret" at all: "Normally matters which are readily and completely disclosed by the product itself cannot constitute a trade secret." *Id.* at 317, 311 N.E.2d at 401, citing *ILG Industries,* 49 Ill.2d at 93, 273 N.E.2d at 396.

The court concludes the procedure or idea PlayWood seeks to protect in this lawsuit is not a secret.

**PlayWood did not Guard the Secrecy of the Trade Secret it Claims**

Under the Illinois Trade Secrets Act, an individual seeking to protect a trade secret must take " 'affirmative measures' to prevent others from using information." *Jackson v. Hammer,* 274 Ill. App. 3d 59, 67-68, 653 N.E.2d 809, 816 (4th Dist. 1995). In this case, the only measure that PlayWood claims to have taken to protect its secret was Mr. Clausi's statement at the February 18 meeting: "I also have some things, some ideas on how to produce the track . . . and I think they're confidential as well." (Transcript of Proceedings (hereinafter "Tr."), 77, 203.) At best, this statement can be characterized only as a vague oral request for confidentiality with respect to undefined

6

manufacturing concepts. The law requires more.

Under PlayWood's own version of events, Mr. Clausi created the "trade secret" on the spot in a matter of minutes by drawing lines on a piece of Learning Curve's toy track product and directing Mr. Borsato to saw into those lines using CNC equipment. Neither Mr. Clausi nor Mr. Moore described this brief exercise as a new design, nor did either of them characterize it as PlayWood's property or invention. (Tr. at 144.) Neither said anything further about the confidentiality they expected would surround their manufacturing methods or Mr. Clausi's design idea. Instead, PlayWood explains, Mr. Clausi gave Mr. Wilson of Learning Curve the prototype that he and Mr. Borsato had created from Learning Curve's track stock without so much as asking for a receipt. (Tr. at 90, 142.) Clausi did not make a duplicate. (*Id.* at 176.) Nobody at PlayWood made or kept drawings of the work, nor did anyone make notes regarding the process or the depth of the cuts made on the track. (*Id.* at 142, 176, 291, 326.) PlayWood faults Mr. Wilson for having lost or destroyed its prototype, but the court finds it more significant that PlayWood, which bears the burden of proving that it made adequate effort to protect its trade secret, never asked Wilson to return the single piece of cut track to it until after this litigation began years later. (*Id.* at 142-43.)

Also significant, in this court's view, is the absence of any written confidentiality agreement between PlayWood and Learning Curve. (Tr. at 109.) PlayWood does not contend that memorializing confidentiality was not its practice; to the contrary, Mr. Clausi had entered into a written confidentiality agreement with Mr. Borsato only three months prior to the meeting with Learning Curve. (Tr. at 95, 112, 341.) And one month after that meeting, PlayWood drafted a written manufacturing proposal to

7

Learning Curve which carefully defined Learning Curve's confidential information but made no reference to PlayWood's own alleged secret. (Tr. at 115-16.) This conduct undermines PlayWood's contention that the oral understanding it claims was reached at the February 1993 meeting is sufficient and enforceable. *Cf. Web Communications*, 889 F. Supp. at 320 (claim that "implicit confidentiality" protected plaintiff's trade secret was undermined by evidence that plaintiff "routinely stamped as 'confidential' those items it believed to be confidential.")

In *Web*, plaintiff's trade secret claim failed because plaintiff took "virtually no steps to protect the confidentiality" of its secret. *Id.* Similarly, in *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F. Supp. 2d 770 (C.D. Ill. 2000), the court concluded that plaintiff's methods and techniques for marketing an element of hog feed did not constitute a "trade secret" under the Illinois Trade Secrets Act where "there was no written record of trade secrets at any time prior to or during [plaintiff's] joint venture" with defendant, and plaintiff "did not insist upon [defendant's] signing a restrictive covenant at any time before, during, or after the joint venture." *Id.* at 779-80. And in *Junkunc v. S.J. Advanced Technology and Mfg. Corp.*, 149 Ill. App. 3d 114, 498 N.E.2d 1179 (1st Dist. 1986), plaintiff had spent approximately $1.7 million over nine years developing a fuel nozzle seal for jet engines; but because the court concluded that plaintiff took inadequate measures to guard the secrecy of the information, it affirmed the denial of a preliminary injunction against defendant, the nephew and former employee of the developer, who took the secret and used it to manufacture seals on his own. PlayWood has argued that if the alleged trade secret "was of enormous potential economic value," the "inquiry truly ends there." (PlayWood's Motion for Entry of

Judgment, at 2.) As *Junkunc* demonstrates, however, even a secret of enormous value will lose its status as a trade secret if care is not taken to protect the confidentiality of the information.

The circumstances here contrast sharply with those of *Peggy Lawton Kitchens, Inc. v. Hogan*, 466 N.E.2d 138 (Mass. App. Ct. 1984), cited by PlayWood for the principle that even a simple innovation in a cookie recipe can constitute a trade secret. (PlayWood's Motion, at 7-8.) The evidence in that case showed that "from the beginning of its use, [plaintiff] carefully guarded the cookie recipe," keeping one copy "locked in an office safe" and another locked in the desk of the company owner's son. *Id.* at 139. Plaintiff kept lists of the three main ingredients on separate note cards that concealed the true proportions of the ingredients and limited access to those cards "to long-time trusted employees." *Id.* Under these circumstances, the trial court properly enjoined the defendant, a former employee not among the trusted few, who gained access to a master key and swiped the recipe. *Id.*

PlayWood suggests its failure to exercise greater care to protect its "secret" is excused by the Seventh Circuit's decision in *Rockwell Graphics Systems, Inc. v. DEV Industries, Inc.*, 925 F.2d 174 (7th Cir. 1991). (PlayWood's Motion, at 9.) The court reversed a summary judgment for the defendants in that case, despite evidence that on some occasions plaintiff had failed to request that copies of its trade secret drawings be returned by vendors. The full text of the Seventh Circuit's ruling makes clear, however, that there was evidence that plaintiff had in fact exercised great caution: It kept all its engineering drawings in a vault. *Id.* at 177. Access "not only to the vault, but also to the building in which it is located" was limited to authorized employees,

9

mainly engineers, who were required to sign confidentiality agreements, return the drawings after using them, and destroy any copies. *Id.* Vendors were permitted to keep copies of piece part drawings, but only after plaintiff reviewed the vendor's "ethical standards." *Id.* at 176-77. *Rockwell* can simply not be read as endorsing trade secret protections in circumstances like those before this court.

The evidence in this case is undisputed that from February 1993, when PlayWood allegedly created the secret and shared it with Learning Curve, until the fall of 1994, PlayWood never asked for any written commitment to confidentiality, never asked PlayWood to return its alleged "prototype," and never once, not even orally, so much as reminded Learning Curve of its purported confidentiality concerns. PlayWood failed to follow up with anyone from Learning Curve to protect the confidentiality of its trade secret. The court concludes PlayWood did not offer evidence of adequate effort to protect its secret.

**The "Secret" Lacked Economic Value**

As discussed earlier, PlayWood offered insufficient evidence that its trade secret derived economic value from its secrecy. In fact, there was no evidence that Mr. Clausi's idea of cutting slits into toy tracks had any economic value. PlayWood was not using its idea itself, nor had PlayWood made any effort to market the idea to other toymakers. (Tr. at 215-16.) Indeed, prior to the meeting at which Learning Curve allegedly misappropriated the "secret," PlayWood's principals had not thought of nor created the secret at all and had no plans to share any such trade secret. (Tr. at 252-3.)

PlayWood's development of this idea consisted of Mr. Borsato's cutting a set of

10

slits into the track and then, on Mr. Clausi's further instructions, deepening the slits. Mr. Clausi acknowledged that the effort was unsuccessful; the initial set of slits did nothing more than mark the ridges of the track, and on Mr. Borsato's second try, he deepened the slits so far into the track rails that a toy train car could not roll along smoothly. (Tr. at 88-89.) Mr. Clausi acknowledged, further, that PlayWood itself made no attempt to refine, develop, manufacture, produce, sell, or license the trade secret. (Tr. at 175, 215.) After the February 18 meeting, PlayWood never prepared any drawings and never prepared another prototype or sample of its secret. (Tr. at 176.) In fact, Mr. Clausi acknowledged that "from a competitive standpoint, that trade secret had no value . . . to PlayWood, because we didn't market that product." (Tr. at 216.) In October 1993, Mr. Clausi prepared a handwritten summary of PlayWood's accomplishments in the previous 12 months. His list does not include any reference to the "trade secret" at issue in this lawsuit. (Tr. at 218-220, Def. Ex. 53.)

The design idea Mr. Clausi claims was his could have no economic value of its own because, had PlayWood refined and developed the notched track product on its own, it could readily have been duplicated by a competitor. As Plaintiff's expert witness acknowledged, the track now on the market, which PlayWood claims was developed from its trade secret, could be reverse-engineered with little effort simply from a physical inspection. The simple and obvious nature of Mr. Clausi's idea dooms its status as a trade secret: "Trade secret law does not protect information that is publicly available, including information that can be discerned with reasonable effort by inspecting a product available for purchase on the market." *Flotec, Inc. v. Southern Research, Inc.*, 16 F. Supp. 2d 992, 1000 (S.D. Ind. 1998).

11

Learning Curve did develop the notched track product and ultimately obtained a patent for it, thus preventing competitors from manufacturing copies.[1] PlayWood contends the existence of Learning Curve's patent does not defeat its claim but instead constitutes further evidence of Learning Curve's misuse of the trade secret. The hole in this argument, in the court's view, is the absence of any evidence that PlayWood sought patent protection on its own. PlayWood suggests that its own good faith is reflected in the fact that it took no action to obtain trademark or patent protection for its trade secret, but the court finds this suggestion unpersuasive. It is undisputed that there was no further communication between PlayWood and Learning Curve about the alleged secret, and certainly no exchange of information that would have falsely assured PlayWood it need not pursue a patent. Even if Mr. Clausi and Mr. Moore believed – despite the absence of any such communication – that Learning Curve was or should have been honoring a confidentiality commitment and working cooperatively

---

[1] In fact, there was unrebutted evidence that by the fall of 1992, Roy Wilson of Learning Curve had conceived of notched track and created a prototype by using the tip of a screwdriver to make notches in plain wooden track. (Tr. at 849, 873.) The court notes that Mr. Wilson's screwdriver project would have resulted in a prototype more similar to the toy now on the market than did Mr. Clausi's work; pressing into the wood with a screwdriver would leave an indentation but would not remove the wood or result in splintering, as use of a CDC machine did. It is undisputed that Learning Curve, not PlayWood, refined, developed, manufactured, and produced the notched track. At least one case suggests that, even assuming that the idea for the cuts in the wood originated with Mr. Clausi and that the idea qualified as a trade secret in other respects, Learning Curve's greater contribution would defeat PlayWood's claim here. *See Wilson v. Electro Marine Systems, Inc.*, 915 F.2d 1110 (7th Cir. 1990) (affirming summary judgment in a trade secret claim where plaintiff, the manufacturer of a boat speedometer, had spent some time and money testing a specialized speedometer product, but it was defendant's labor and expertise that put the improved speedometer together).

12

with PlayWood to develop the new track product, nothing prevented PlayWood from seeking a patent in which it then might offer Learning Curve a license. Significantly, once PlayWood learned of the issuance of the patent to Learning Curve, it made no effort to challenge the validity of the patent or Mr. Wilson's identity as the inventor. Although this circumstance does not defeat PlayWood's claim, it supports the conclusion that PlayWood's belief that its idea was a "trade secret" developed long after the February 1993 meeting.

The court concludes the evidence is insufficient to show that PlayWood's secret had value.

**Little Time, Effort and Money were Expended to Develop the "Secret"**

One of the primary factors in determining the existence of a trade secret is the amount of time, effort, and money expended in developing the information. Enforcement of a trade secret is a restraint on competition; in case after case, courts recognize that such a restraint is appropriate where plaintiff has made a significant investment of time and resources in a process or information. *See Minnesota Mining and Mfg. Co. v. Pribyl,* 259 F.3d 587, 596 (7th Cir. 2001) (recognizing a trade secret in a "process which it took the company six years and considerable income to perfect"); *Mangren Research and Development Corp. v. National Chem. Co.,* 87 F.3d 937, 942 (7th Cir. 1996) (trade secret proven where improvement in mold release agent was the product of "eighteen months of intensive research and testing"); *Syntex Ophthalmics Inc. v. Tsuetaki,* 701 F.2d 677, 680 (7th Cir. 1983) (district court properly enjoined misappropriation where plaintiff "spent more than an additional one million dollars and twenty man-years of time to develop . . . oxygen permeable polycon [contact] lens

material"); *Televation Telecomms. Sys., Inc. v. Saindon*, 169 Ill. App. 3d 8, 16, 522 N.E.2d 1359,1365 (2d Dist. 1988) (trial court did not err in recognizing trade secrets in schematics and circuitry where plaintiff's engineer "spent approximately five years designing, developing, and modifying the analog circuitry"); *Metallurgical Indus. Inc. v. Fourtek, Inc*, 790 F.2d 1195, 1202 (5th Cir. 1986) (Texas law; recognizing a trade secret in modifications on zinc recovery furnaces where "such details as the types and amounts of chemicals to be used and the times and temperatures for cleaning the fasteners were developed . . . through extensive trial and error and at considerable expense"); *First Health Group Corp. v. National Prescription Admins., Inc.*,155 F. Supp. 2d 194, *225 (M.D.Pa. 2001) (applying Illinois law and recognizing that plaintiff's bidding system constituted a trade secret because plaintiff "invested a great deal of time and money in developing its bid method over the years it managed the program").

On this primary factor, PlayWood's evidence is wholly lacking. As both Moore and Clausi acknowledged, there was no secret at the time the February 18, 1993 meeting began, and no intention of conveying any such secret to Learning Curve. Mr. Clausi's idea was realized in a matter of minutes. He drew lines on the sample of track that Learning Curve provided him and directed Mr. Borsato to cut slits into the wood. By Clausi's own estimate, provided in PlayWood's case in chief, the cost to PlayWood to develop this secret was less than one dollar and the time spent was less than thirty minutes. (Tr. at 88, 137-39.) No reported decision recognizes such a limited investment as sufficient to create a trade secret.

In *Web Communications*, for example, where plaintiff devoted "three, four hours,

14

perhaps" to sketching drawings and folding paper for an advertising insert, Judge Aspen concluded the product was not a protectable trade secret. 889 F. Supp. at 319. *See Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063, 1073, 1075 (7th Cir. 1992) (no trade secret absent evidence of substantial expenditure of resources in conjunction with development of trade secret); *Filter Dynamics Int'l v. Astron Battery, Inc.*, 19 Ill. App. 3d 299, 316, 311 N.E.2d 386, 400 (2d Dist. 1974) ($40,000 spent in connection with printing, design, artwork and graphic and construction costs were insufficient, without further breakdown as to actual development costs and effort expended, to support trade secret protection); *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 665, 679-680 (D. Md. 2000) (applying Illinois law; dismissing counterclaim where the technique claimed as a trade secret was a "common-sense method" and there was "no evidence that this practice cannot be readily duplicated without involving considerable time, effort or expense.") Against this substantial body of law, PlayWood offers *Forest Labs., Inc. v. Pillsbury Co.*, 452 F.2d 621, 624 (7th Cir. 1971) (PlayWood's Memo, at 5-6) where the Seventh Circuit observed that "a trade secret need not be essentially new, novel or unique" and that "it may be intrinsically simple and nevertheless qualify as a secret." As the district court opinion makes clear, however, even in that case the developer of the secret had "spent a long time developing and testing the process before he was able to devise a packaging procedure that insured stability." *Forest Laboratories, Inc. v. Formulations, Inc.*, 299 F. Supp. 202, 208 (E.D. Wis. 1969).

PlayWood's personnel had not developed the "secret" prior to the February 1993 meeting with Learning Curve representatives. No research had been done, nor had

PlayWood developed any test prototypes, made any calculations of the appropriate depth of the cuts, or evaluated the potential integrity or smoothness of the track pieces after cuts were made in them. Mr. Clausi was forthcoming and straightforward in testifying that PlayWood's investment in its "trade secret" was no more than a half hour's time and less than one dollar in supplies. Such an insignificant investment is, in this court's view, insufficient as a matter of Illinois law to establish the status of a "trade secret."

## CONCLUSION

As Learning Curve argues, what PlayWood created on February 18, 1993 was a piece of cut toy track that "could be quickly and easily duplicated by others, absent patent protection which PlayWood did not have or even attempt to secure." (Learning Curve Memo at 14.) PlayWood spent less than a dollar and about a half-hour developing its secret and took no steps to protect its confidentiality. The evidence is insufficient to support its claims as a matter of law. The court denies PlayWood's motion for entry of judgment (Doc. No. 198-1), and grants Learning Curve's motion for judgment under Rule 50.

ENTER:

Dated: March 14, 2002

REBECCA R. PALLMEYER
United States District Judge